UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILBERT HURST,
      Plaintiff,

vs.                             Case No.: 4:18cv237/RH/EMT

CENTURION OR FLORIDA LLC, et al.,
      Defendants.
_____/

## **REPORT AND RECOMMENDATION**

Plaintiff Wilbert Hurst (Hurst) is a Florida inmate proceeding pro se and in forma pauperis in this civil rights case brought under 42 U.S.C. § 1983. Five of the six Defendants have been served with process and appeared. Presently before the court are cross-motions for summary judgment (MSJs) filed by Hurst, Defendant Dr. Ong, and Defendants Dr. Perez-Lugo, Dr. Campbell, and Centurion of Florida, LLC (Centurion Defendants) (ECF Nos. 83, 84, 85). Also pending is a motion to dismiss filed by Defendant Nurse Zebley[1] (ECF No. 134). The court provided Hurst an opportunity to respond to Nurse Zebley's motion (*see* ECF No. 135), but he has not done so as of today's date.

---

[1] Although Nurse Zebley was an employee of Centurion at all relevant times, and is represented by Centurion's counsel, she did not join the Centurion Defendants' MSJ and instead filed a motion to dismiss. Therefore, the court does not include her in its references to the Centurion Defendants.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).   Upon consideration of the record and the relevant law, the undersigned recommends that Dr. Ong's and the Centurion Defendants' MSJs be granted, and Hurst's MSJ be denied, because the evidence is such that a reasonable jury could not conclude that any of the movant Defendants violated Hurst's constitutional rights by exhibiting deliberate indifference to his serious medical needs.   The undersigned recommends that Hurst's claim against Defendant Nurse Zebley be dismissed for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and § 1915A(b)(1).   Lastly, the undersigned recommends that Hurst's claim against the unserved Defendant, Christin Judd Delaney, RN, be dismissed for failure to effect service of process, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

I.      BACKGROUND

The operative pleading in this case is Hurst's Third Amended Complaint (Pl.'s Third Am. Compl., ECF No. 36).   Hurst claims that Defendants were deliberately indifferent to his medical needs, in violation of the Eighth Amendment, by delaying

surgery for a fractured finger and failing to provide post-operative physical therapy (*id.* at 3–17).   Hurst seeks a declaratory judgment, injunctive relief, and compensatory and punitive damages (*id.* at 18).

On March 25, 2020, Hurst filed a motion for partial summary judgment with supporting evidentiary materials (Pl.'s Mot. Partial Summ. J., ECF No. 83; *see also* ECF No. 124).   Hurst argues he is entitled to judgment in his favor on the issue of liability, and trial is warranted only on the issue of damages (*id.*).   Dr. Ong and the Centurion Defendants filed responses in opposition to Hurst's MSJ (Centurion Defs.' Resp. in Opp'n, to Pl.'s Mot. Summ. J., ECF No. 95; Def. Ong's Resp. in Opp'n, to Pl.'s Mot. Summ. J., ECF No. 96).

On March 27, 2020, Dr. Ong and the Centurion Defendants filed MSJs with supporting evidentiary materials (Def. Ong's Mot. Summ. J., ECF No. 84; Centurion Defs.' Mot. Summ. J., ECF No. 85).   Hurst filed a response in opposition to each motion (Pl.'s Resp. in Opp'n, to Centurion Defs.' Mot. Summ. J., ECF No. 97; Pl.'s Resp. in Opp'n, to Def. Ong's' Mot. Summ. J., ECF No. 125).   Defendants filed replies to Hurst's responses (Centurion Defs.' Reply, ECF No. 101; Def. Ong's Reply, ECF No. 126).

On November 9, 2020, Nurse Zebley filed a motion to dismiss the Third Amended Complaint, on the ground that Hurst failed to exhaust administrative remedies (Zebley's Mot. to Dismiss, ECF No. 134).  As previously noted, Hurst has not filed a response to that motion.

## II.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Applicable Legal Standards

#### 1.    Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his case or present affirmative evidence that the nonmoving party will be unable to prove his case at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" if the "evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.* at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

To defeat summary judgment, the nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586.  Speculation or conjecture from a party cannot create a genuine issue of material fact.  *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  And "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *see also Celotex Corp.*, 477 U.S. at 324.  The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See Celotex Corp.*, *supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jones v. Cannon*, 174 F. 3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove.  *See Celotex Corp.*, 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

The standards governing cross-motions for summary judgment are the same, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the non-movant. *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1404 (S.D. Fla. 2014) (citations omitted); *Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, 443 F. Supp. 2d 1284, 1293–94 (N.D. Ala. 2006).

### 2.     Deliberate Indifference to Medical Needs

The Eighth Amendment prohibits infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  Stating a claim under the clause thus requires satisfying two minima (from which the case law has ultimately derived four requirements).  First, there must be, objectively speaking, conduct by public officials "sufficiently serious" to constitute a cruel or unusual deprivation—one "denying 'the minimal civilized measure of life's necessities.'"  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Second, there must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish.  *See Wilson*, 501 U.S. at 300 ("The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual punishment.  If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." (emphasis in original)).

In the context of denial of medical care, each of these minima has been more specifically described as encompassing two subsidiary requirements.  To show an objectively serious deprivation, it is necessary to demonstrate, first, an objectively

"serious medical need[ ]," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), one that, if left unattended, "pos[es] a substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Second, it is necessary to demonstrate that the response made by the public official to that need was poor enough to constitute "an unnecessary and wanton infliction of pain," and not merely accidental inadequacy, "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law. *Estelle*, 429 U.S. at 105–06. Similarly, to show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of "deliberate indifference," *id.* at 105, which is in turn defined as requiring two separate things: "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . draw[ing of] the inference," *Farmer*, 511 U.S. at 837. Ultimately, there are thus four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference

of required action from those facts.  *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000).

Eleventh Circuit cases have given substance to *Estelle*'s distinction between "deliberate indifference" and mere negligence, explicating categories of action or inaction that may constitute deliberate indifference.  The Eleventh Circuit repeatedly found that an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care and fails or refuses to obtain medical treatment for the inmate.  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (citations omitted).

"Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable."  *McElligott*, 182 F.3d at 1255; *see also Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) ("The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay.  A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate

indifference."); *see also Farrow*, 320 F.3d at 1246 (a defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[A]n unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference.").

"A prisoner bringing a deliberate-indifference claim has a steep hill to climb." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). The Eleventh Circuit has held, for instance, that the Constitution does not require that the medical care provided to prisoners be "perfect, the best obtainable, or even very good." *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991) (quotation omitted). Rather, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* at 1505 (quotation omitted). The Eleventh Circuit has also emphasized—as have its sister circuits—that "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Id.*; *accord, e.g., Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) ("We have consistently held that prison officials do not act with deliberate

indifference when they provide medical treatment even if it is subpar or different from what the inmate wants."); *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc) ("[The Eighth Amendment] does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing.").

### B.    Material Facts for Purposes of Summary Judgment

The facts pertinent to the resolution of the parties' motions are drawn from Hurst's verified Third Amended Complaint (ECF No. 36) and the evidence in the summary judgment record (ECF Nos. 83, 84, 85, 97, 124). *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding specific facts pled in a sworn complaint must be considered in opposition to a motion for summary judgment). Where the parties offer conflicting accounts of the events in question, the court "sets forth the facts, drawn from the evidence presented, in the light most favorable to the" nonmoving party. *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1265 (11th Cir. 2005). Nevertheless, matters stated by a court as "facts" for purposes of summary judgment review may not be the actual facts. *See Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

Regarding the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions**.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> . . . .
> **(4) Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of summary judgment.  *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); Fed. R. Civ. P. 56(c).  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment.  *See* Fed. R. Civ. P. 56(e)(2).

At the time of the events underlying Hurst's claims, Centurion contracted with the FDOC to provide medical services to inmates in FDOC institutions (Pl.'s Third Am. Compl., ECF No. 36 at 2).  On January 5, 2017, Hurst sustained a fracture to the fifth metacarpal neck of his right hand during an altercation with another inmate at Union Correctional Institution (Pl.'s Third Am. Compl., ECF No. 36 at 3, 5–6; Def. Ong's Statement Undisputed Material Facts, ECF No. 84 at 3–4; Centurion Defs.' Statement of Undisputed Facts, ECF No. 85 at 3).

Hurst states that immediately after he injured his hand on January 5, 2017, he was escorted for a pre-confinement health evaluation (Hurst Decl. ⁋ 3, ECF No. 83 at 18–19).  Hurst states he was seen by Defendant Nurse Delaney (*id.*).[2]  Hurst states he notified Delaney that his right hand was swollen and painful, and he believed that the hand was broken (*id.*).  Hurst states Nurse Delaney refused to provide any medical care and instead told him he would have to wait to see a doctor at his next doctor appointment, which was not until April (three months later) (*id.*).  Hurst states Nurse Delaney completed a Pre-Special Housing Health Evaluation form but falsely reported that Hurst had no medical complaints (*id.*; *see also* FDOC Pre-Special

---

[2]  Hurst refers to Nurse Delaney as "Nurse Jane Doe I" in his Third Amended Complaint.  Through Hurst's efforts during discovery, and the court's assistance, Centurion identified this Defendant as Christin Judd Delaney, RN (*see* ECF Nos. 100, 102, 103, 104).

Housing Health Evaluation form, ECF No. 83 at 17).  Hurst states he was escorted to administrative confinement and requested an Inmate Sick-Call Request form from an officer, but the officer told him that he needed to obtain the form from the nurse (Hurst Decl. ⸙ 3, ECF No. 83 at 21–22).

A few days later, on January 8 or 9, 2017, at 5:00–5:30 a.m., Hurst spoke with Defendant Nurse Zebley as she was making her morning medication rounds in the administrative confinement unit (Hurst Decl. ⸙ 3, ECF No. 83 at 21–22).[3]  Hurst showed Nurse Zebley his hand and told her that it was swollen and painful, and that he believed it was broken (*id.*).  Nurse Zebley provided Hurst with the sick-call form (*id.*).  Hurst completed the form and gave it back to Nurse Zebley (*id.*).  Hurst was not seen in sick-call, and the sick-call request is not in Hurst's medical file (*id.*).  Hurst alleges "upon information and belief" that Nurse Zebley discarded the sick-call request instead of processing it (*id.*).

Hurst was released from administrative confinement on January 12, 2017 (Pl.'s Third Am. Compl., ECF No. 36 at 5).  On January 15, 2017, Hurst submitted an inmate sick-call request complaining of swelling in his right hand and his inability

---

[3] Hurst refers to Nurse Zebley as "Nurse Jane Doe II" in his Third Amended Complaint.  Centurion identified this Defendant as Kristina M. Zebley, LPN (*see* ECF Nos. 100, 102, 103, 104).

to move his little finger (FDOC Inmate Sick-Call Request, ECF No. 85-1 at 68). The sick-call request was received by the medical department on January 17 (*see id.*). The next day (January 18, 2017), a nurse assessed Hurst's finger (FDOC Fracture/Dislocation/Sprain Protocol, ECF No. 85-1 at 66–67). Hurst reported his pain level as a 5 out of 10 (*id.*). The nurse noted no deformity, mild swelling, that the skin was pink and warm, and that Hurst was able to wiggle the finger (*id.*). The nurse instructed Hurst to elevate his hand, apply a warm, moist towel, and report any discoloration, coolness, tingling, numbness, or increase in pain (*id.*). The nurse also provided Hurst pain medication (*id.*). That same day, Dr. J. Bichara ordered x-rays of Hurst's right hand and fingers, which were performed on January 20, 2017 (a Friday) (FDOC Radiology Request Form, ECF No. 85-1 at 80). The x-rays revealed that Hurst suffered an "acute comminuted displaced fracture present in the distal 5th metacarpal with soft tissue swelling" (Schryver Medical, LLC Radiology Interpretation, ECF No. 85-1 at 79).

Dr. Bichara reviewed the radiology report on January 24, 2017 (just two business days after the x-rays were performed) (Schryver Medical, LLC Radiology Interpretation, ECF No. 85-1 at 79), and met with Hurst on January 27 to review it with him (FDOC Chronological Record of Health Care, ECF No. 85-1 at 65).

During that visit, Dr. Bichara referred Hurst for an "urgent" plastic surgery consultation and prescribed Tylenol for pain control (FDOC Chronological Record of Health Care, ECF No. 85-1 at 65; FDOC Physician's Order Sheet, ECF No. 83 at 26). The referral was forwarded to the scheduling department (*see* FDOC Chronological Record of Health Care, ECF No. 85-1 at 65).

On February 13, 2017, Hurst submitted a sick-call request inquiring whether surgery was approved and requesting a written medical pass for a right-hand support (FDOC Inmate Sick-Call Request, ECF No. 85-1 at 63). On February 14, 2017, the scheduling department scheduled Hurst for a plastic surgery assessment with Defendant Dr. Ong, a contract physician with the FDOC, on February 15 (FDOC Chronological Record of Health Care, ECF No. 85-1 at 64).

Hurst saw Defendant Dr. Ong at the Reception and Medical Center (RMC) on February 15, 2017 (Def. Ong's Aff. ¶ 2, ECF No. 84-1; FDOC Chronological Record of Health Care, ECF No. 85-1 at 64). Dr. Ong ordered an x-ray, which revealed an overlapping fracture of Hurst's right fifth metacarpal (Ong Aff. ¶ 2, ECF No. 84-1; FDOC Radiology Request Form, ECF No. 85-1 at 78). Dr. Ong determined that Hurst required surgery, explained the risks and benefits of surgery, and received Hurst's written consent to undergo an open reduction and internal fixation procedure

as soon as possible (Ong Aff. ¶ 2, ECF No. 84-1; FDOC Consent for Surgical Procedure(s) and Anesthesia, ECF No. 85-1 at 30).   Dr. Ong completed and submitted a Request for Pre-Approval of Health Care Services form that day (February 15, 2017) as required by the FDOC (Ong Aff. ¶ 2, ECF No. 84-1; FDOC Request for Pre-Approval of Health Care Services, ECF No. 1-1 at 15).   Dr. Ong specifically indicated on the form that the procedure was "urgent" and noted "for surgery tomorrow" (*id.*).   The medical record from Dr. Ong's assessment also indicates, "primary care physician at permanent institution to approve/arrange request" (FDOC Chronological Record of Health Care, ECF No. 85-1 at 64).   Hurst was returned from the RMC to Union C.I. (Hurst Decl. ¶¶ 5–6, ECF No. 83 at 30). He met with Defendant Dr. Perez-Lugo and a nurse, and Hurst informed Dr. Perez-Lugo that the surgery was postponed until the next week (Hurst alleges the officer who transported him from the RMC to Union C.I. told him that the surgery was postponed until the next week) (Pl.'s Third Am. Compl., ECF No. 36 at 7; *see also* FDOC Chronological Record of Health Care, ECF No. 85-1 at 64).

On February 16, 2017, Defendant Dr. Ong held surgical hours in the RMC's Mobile Surgery Unit in Lake Butler, Florida (Ong Aff. ¶ 3, ECF No. 84-1).   Dr. Ong was "ready, willing and able" to conduct Hurst's surgery that day and expected that

Hurst would present for the surgery as Ong had requested the day before (*id.*).  Hurst did not present to Dr. Ong for surgery on February 16, 2017 (Ong Aff. ⸿ 4).  Dr. Ong was not involved in scheduling the surgery once he submitted the required Request for Pre-Approval of Health Care Services form (*id.*).  Dr. Ong played no role in any cancellation or postponement of Hurst's surgery (*id.*).[4]

On February 17, 2017, Defendant Dr. Perez-Lugo pre-approved Hurst's surgery by signing the Request for Pre-Approval of Health Care Services form which Dr. Ong had completed on February 15 (FDOC Chronological Record of Health Care, ECF No. 85-1 at 64; FDOC Request for Pre-Approval of Health Care Services, ECF No. 1-1 at 15).  The pre-approval form was not sent to the FDOC's Utilization Management section for final approval and scheduling until February 28, 2017 (FDOC Request for Pre-Approval of Health Care Services, ECF No. 1-1 at 15; FDOC Chronological Record of Health Care, ECF No. 85-1 at 64).

On March 1, 2017, Hurst submitted an inmate request inquiring about the date of his surgery (FDOC Inmate Request, ECF No. 85-1 at 37).  In the request, Hurst stated that Dr. Ong scheduled him for surgery on February 16, 2017, but he was

---

[4] Also on February 16, 2017, a nurse at Union C.I. saw Hurst in sick call regarding his request for a medical pass for the hand support (FDOC Chronological Record of Health Care, ECF No. 85-1 at 62).  The nurse referred Hurst's chart to a doctor, and Dr. George issued the medical pass for the wrist support (FDOC Health Slip/Pass, ECF No. 85-1 at 3).

subsequently told it was rescheduled for the following week (*id.*).  Hurst expressed

concern that if too much time passed, the surgery would not be successful (*id.*).

Hurst asked, "They didn't forget me did they?" (*id.*).  Centurion's Health Services

Administrator responded to Hurst's inmate request as follows:

> Reviewed records indicate you have been approved for surgery.  We
> are awaiting your appointment date.  Should you experience problems,
> sick call is available.

(FDOC Inmate Request, ECF No. 85-1 at 37; *see also* Centurion Defs.' Statement

of Undisputed Facts, ECF No. 85 at 5).

On March 7, 2017, Hurst submitted another inmate request inquiring about

the date of his surgery (FDOC Inmate Request, ECF No. 85-1 at 36).   Hurst

complained that he still had not had the surgery; his hand was "getting worse"; and

he was in constant pain (*id.*).  Hurst was seen by a nurse on March 13, 2017 (FDOC

Chronological Record of Health Care, ECF No. 85-1 at 60).  The nurse contacted

the scheduling department and determined that surgery was approved, and an

appointment date was pending (*id.*).  The nurse instructed Hurst to access sick call

if needed (*id.*).  Centurion's Health Services Administrator responded to Hurst's

inmate request as follows:

> Reviewed records indicate you have been approved for surgery.  We
> are awaiting an appointment date.  Should you experience problems,

> sick call is available.  Please be advised that sometimes appointments
> get rescheduled due to circumstances beyond our control.  We have
> contacted scheduling to inquire about an appointment.

(FDOC Inmate Request, ECF No. 85-1 at 36).

On March 30, 2017, Hurst presented to Defendant Dr. Ong for surgery (Ong Aff. ⁋ 5, ECF No. 84-1).  Dr. Ong performed the surgery on Hurst's right hand, which included the following procedures:  (a) osteotomy of the right fifth metacarpal neck; (b) open reduction internal fixation of the right fifth metacarpal neck; (c) video fluoroscopy; (d) post-operative finger nerve block; and (e) application of hand, wrist splint (Ong Aff. ⁋ 5; FDOC surgical records, ECF No. 85-1 at 16, 19–32).  Dr. Ong identified the fracture, used a saw to take away parts of the bone, aligned it and then put in temporary pins to help repair the displaced fracture (Ong Aff. ⁋ 5, ECF No. 84-1).  Hurst's exterior tendons were retracted during surgery to allow for access to the facture site (Def. Ong's Answer to Pl.'s Interrog. No. 13, ECF No. 83 at 46).  This was a normal aspect of this type of surgery, and Hurst's tendons were completely unharmed during the surgery (*id.*).  Although Hurst's injury was some twelve weeks old at the time of his surgery, it is Dr. Ong's medical opinion that the surgery went well without complication and was ultimately successful (Ong Aff. ⁋ 5, ECF No. 84-1; Ong's Ans. To Interr. No. 13, ECF No. 83 at 46).  After the

procedure, Dr. Ong prescribed Hurst antibiotics, pain medication and calcium supplements, and explained that he was to wear the hand wrist splint until the bone healed (Ong Aff. ⁋ 5; FDOC Surgical Patient Discharge Planning Summary, ECF No. 85-1 at 21). Dr. Ong instructed that Hurst return to the clinic in two weeks to remove the sutures (FDOC surgical records, ECF No. 85-1 at 19, 21).

Defendant Dr. Perez-Lugo approved Hurst's wrist support and an ACE wrap (FDOC Health Slip/Pass, ECF No. 85-1 at 2, 4, 5). On April 3, 2017, Hurst had a follow-up visit with a nurse, who noted that results of blood tests were pending (FDOC Chronological Record of Health Care, ECF No. 85-1 at 58).

On April 4, 2017, Dr. Cabrero noted that Dr. Ong's request for a post-operative assessment was not accepted by Centurion and "needs to be rewritten by the sending institution's physician" (FDOC Chronological Record of Health Care, ECF No. 85-1 at 58). On April 10, 2017, Dr. Cabrero completed a request for a follow-up consultation with Dr. Ong (FDOC Consultation Request/Consultant's Report, ECF No. 1-1 at 32).

On April 18, 2017, the scheduling department scheduled Hurst for a follow-up visit with Defendant Dr. Ong the next day (April 19) (FDOC Chronological Record of Health Care, ECF No. 85-1 at 57). On April 19, 2017, Dr. Ong saw Hurst

for his first post-operative visit (Ong Aff. ℙ 6, ECF No. 84-1).  After an examination showed the wound to be healing well, and an x-ray revealed a healing fracture, Dr. Ong removed Hurst's sutures, cleaned the surgical sites, and requested that Hurst be returned to the clinic in approximately four weeks for a repeat x-ray and removal of the surgical pins (Ong Aff. ℙ 6; FDOC Radiology Request Form, ECF No. 85-1 at 77; Schryver Medical, LLC, Radiology Interpretation, ECF No. 85-1 at 76; FDOC Chronological Record of Health Care, ECF No. 85-1 at 57).

On April 24, 2017, Defendant Dr. Perez-Lugo reviewed Hurst's chart, and a nurse sent Hurst's records to the scheduling department (FDOC Chronological Record of Health Care, ECF No. 85-1 at 57).

On May 23, 2017, the scheduling department scheduled Hurst for a follow-up visit with Defendant Dr. Ong the next day (May 24) (FDOC Chronological Record of Health Care, ECF No. 85-1 at 56).  On May 24, 2017, Dr. Ong saw Hurst for his second post-operative visit (Ong Aff. ℙ 7, ECF No. 84-1; FDOC Chronological Record of Health Care, ECF No. 85-1 at 56).  An x-ray confirmed that the bone was adequately healed to allow for removal of the surgical pins (Ong Aff. ℙ 7, ECF No. 84-1; Schryver Medical, LLC Radiology Interpretation, ECF No. 85-1 at 74–75). The x-ray also indicated increasing osteopenia consistent with disuse osteoporotic

disease (Schryver Medical, LLC Radiology Interpretation, ECF No. 85-1 at 74).  Dr. Ong recommended hand physical therapy three times per week for eight weeks and instructed Hurst to return in four weeks for another x-ray (Ong Aff. ⁋ 7, ECF No. 84-1; FDOC Chronological Record of Health Care, ECF No. 85-1 at 56).  Defendant Dr. Perez-Lugo reviewed Hurst's chart the same day (May 24) (FDOC Chronological Record of Health Care, ECF No. 85-1 at 56).  A nurse sent Hurst's chart to the scheduling department to schedule the follow-up appointment with Ong (*id.*).  There is no evidence in the record that any health care provider completed a Consultation Request for Hurst to receive an evaluation with a physical therapist.

On June 28, 2017, Hurst returned to Defendant Dr. Ong for his third post-operative follow-up appointment (Ong Aff. ⁋ 8, ECF No. 84-1).  Hurst's x-ray results revealed a healed fracture and "disuse osteoporosis suspected" (Schryver Medical, LLC Radiology Interpretation ECF No. 85-1 at 72–73.)  An examination revealed a diminished range of motion in all fingers of Hurst's right hand (Ong Aff. ⁋ 8, ECF No. 84-1).  Dr. Ong repeated his request for physical therapy, this time prescribing two visits per week for eight weeks; and Ong advised Hurst of how absolutely crucial it was for him to begin his therapy in advance, by performing home exercises that Dr. Ong demonstrated, if he hoped to have any decent chance of recovery of function

(*id.*).  Dr. Ong renewed Hurst's prescription for pain medication and asked that he

return to the clinic after completion of his physical therapy regimen (*id.*).  Following

Hurst's appointment with Dr. Ong, a nurse referred Hurst's chart to a doctor for

review (FDOC Chronological Record of Health Care, ECF No. 85-1 at 55).

Defendant Dr. Perez-Lugo reviewed Hurst's chart on July 10, 2017, and

requested that Hurst receive a consultation with a physical therapist (FDOC

Chronological Record of Health Care, ECF No. 85-1 at 55; FDOC Consultation

Request/Consultation Report, ECF No. 85-1 at 7).  A nurse referred Hurst's chart

and the physical therapy request form to the scheduling department (*id.*).  The nurse

also scheduled Hurst for a follow-up appointment in the "doctors clinic" for August

30, 2017 (*id.*).

On July 31, 2017, the scheduling department scheduled Hurst for the physical

therapy consultation the next day (August 1) (FDOC Chronological Record of

Health Care, ECF No. 85-1 at 55).  On August 1, 2017, Hurst had an initial

consultation with a physical therapist, John Palmer (FDOC Chronological Record of

Health Care, ECF No. 85-1 at 55; FDOC Consultation Request/Consultation Report,

ECF No. 85-1 at 8).  Therapist Palmer noted a "mallet finger deformity" of the

"DIP" joint of Hurst's right little finger (FDOC Consultation Request/Consultation

Report, ECF No. 85-1 at 8)).    "Mallet finger," or drooping downward of the fingertip, is generally caused by a disruption or rupture of the extensor tendon at the distal interphalangeal (DIP) joint, which is typically the result of trauma or a sudden flexing of the tip of the finger (Def. Ong's Answer to Pl.'s Interrog. No. 14, ECF No. 83 at 46).  Therapist Palmer recommended:  (1) a finger splint for the deformity of the little finger, (2) physical therapy two times a week for eight weeks to improve flex, range of motion, grip, and other mobility of Hurst's right hand and little finger, and (3) a follow-up appointment with Dr. Ong after physical therapy was completed, as Dr. Ong had previously ordered (FDOC Consultation Request/Consultation Report, ECF No. 85-1 at 8).  Therapist Palmer also provided Hurst a home exercise program (*id.*).

The next day (August 2), Defendant Dr. Perez-Lugo completed a request for prior approval for Hurst to receive physical therapy two times a week for eight weeks (FDOC Request for Prior Approval of Health Care Services, ECF No. 83 at 52).  The request was faxed to Utilization Management on August 3, 2017, and approved (*id.*).

On August 30, 2017, Hurst was seen by Defendant Dr. Perez-Lugo for a follow-up of the physical therapy consultation (FDOC Chronological Record of Health Care, ECF No. 85-1 at 54).  Dr. Perez-Lugo reviewed the Consultation Report

and discussed it with Hurst (*id.*).  Dr. Perez-Lugo advised Hurst that prior approval for physical therapy was approved, and that an appointment was pending (*id.*).

Hurst received a physical therapy session on September 1, 2017, with physical therapist Connie Spitzer (FDOC Chronological Record of Health Care, ECF No. 85-1 at 53).  Therapist Spitzer noted that Hurst had made "some good improvement" since his initial evaluation but had not completely met the goals set by the primary physical therapist (Mr. Palmer) (*id.*).  Therapist Spitzer noted that Hurst would benefit from continued physical therapy two times a week for three weeks to further improve strength and range of motion in his right hand (*id.*).  Defendant Dr. Perez-Lugo reviewed Hurst's chart, and it was sent to the scheduling department (*see id.*).

Hurst received physical therapy sessions (with Therapist Spitzer) on September 21 and September 26, 2017 (FDOC Chronological Record of Health Care, ECF No. 85-1 at 51–52).  At the conclusion of the appointment on September 26, Therapist Spitzer noted that Hurst would benefit from continued physical therapy two times a week for four weeks to continue to improve his strength, range of motion, and functional ability of his right hand (*id.* at 52).

Hurst was never returned to Defendant Dr. Ong for follow-up as Ong had instructed; and Dr. Ong was never asked to see or otherwise evaluate Hurst after

June 28, 2017 (Ong Aff. ¶¶ 9–10, ECF No. 84-1).  Dr. Ong was not copied on Hurst's physical therapy records (Ong states it is common for him not to be copied on such records with FDOC patients) so there was no way Ong could have known that Hurst did not receive the number of physical therapy treatments Ong had prescribed (*id.*, ¶ 9).  In Dr. Ong's medical judgment, he provided proper treatment for Hurst's injury (*id.*, ¶ 11).

On November 7, 2017, Hurst was seen by a nurse for a flu shot, renewal of asthma medication, and complaints of pain in his right hand (FDOC Chronological Record of Health Care, ECF No. 85-1 at 50).  The nurse's notes were "staffed" to a doctor (Dr. Toledo), and a prescription for asthma medication was sent to the pharmacy (*id.*).

Hurst saw Defendant Dr. Perez-Lugo on November 17, 2017 (Hurst Decl. ¶ 4, ECF No. 83 at 49).  When Hurst inquired as to whether the delay in his surgery affected its outcome, Dr. Perez-Lugo responded, "Yes" (*id.*).  When Hurst inquired about surgery to correct the deformity of his little finger and his inability to bend it, Dr. Perez-Lugo opined that there was little chance of improvement (*id.*).  However, Dr. Perez-Lugo completed a request for Hurst to receive a follow-up consultation with Dr. Ong to evaluate Hurst's inability to make a fist, decreased range of motion,

and deformity, and to make further recommendations (FDOC Consultation Request/Consultation Report, ECF No. 83 at 47; Hurst Decl. ¶ 4, ECF No. 83 at 49). Apparently, Dr. Perez-Lugo's request was rejected, as indicated by the following notations on the Consultation Report:

-Please repeat hand x-ray
-Encourage pt [patient] to continue exercises taught by PT [physical therapy]
-It is unclear what actions pt is unable to perform and how it is affecting ADL's [activities of daily living]
-Call RMD [Regional Medical Director] to discuss

(Consultant's Report, ECF No. 83 at 50).  Defendant Dr. Erron Campbell was the Regional Medical Director at that time (Def. Campbell's Resp. to Pl.'s Req. for Admiss. No. 1; ECF No. 83 at 51).

On January 10, 2018, Dr. Toledo ordered x-rays of Hurst's right hand (FDOC Radiology Request Form, ECF No. 85-1 at 11, 49).  On January 26, 2018, Hurst had a follow-up appointment with a nurse, who advised him that the x-ray was rescheduled from its original date and would be done on January 29 (*id.* at 48).  The x-ray was performed on January 29, and showed "no radiographic evidence of acute disease in the right hand" (MobilexUSA Radiology Report, ECF No. 85-1 at 10).

On February 17, 2018, Hurst submitted an inmate sick-call request complaining of pain in his hand, especially when the weather was cold and wet

(FDOC Inmate Sick-Call Request, ECF No. 85-1 at 47). Hurst requested pain medication stronger than the medication available in the officers' station (*id.*). Hurst was seen by a nurse on February 21, and reported a pain level of 5 out of 10 (FDOC Chronological Record of Health Care, ECF No. 85-1 at 46). The nurse referred Hurst's chart to a doctor for pain management (*id.*). On February 23, 2018, Dr. Toledo prescribed Tylenol 650mg as needed for three months (FDOC Chronological Record of Health Care, ECF No. 85-1 at 46; FDOC Clinician's Order Sheet, ECF No. 1-1 at 51).

Also on February 23, 2018, Defendant Dr. Perez-Lugo denied Hurst's medical grievance requesting corrective surgery (FDOC Inmate Grievance and Response to Formal Grievance Log Number 1802-213-078, ECF No. 83 at 56, 60). Dr. Perez-Lugo advised Hurst that he had an upcoming appointment scheduled in the near future and should discuss his concerns then; and if Hurst experienced problems or had concerns before then, sick-call was available (Response to Formal Grievance, ECF No. 83 at 60).

On February 26, 2018, Hurst submitted an inmate sick-call request complaining that performing the duties of his job as a cart pusher was causing pain in his hand (FDOC Inmate Sick-Call Request, ECF No. 85-1 at 45). Hurst requested

a medical restriction pass for no pulling or pushing (*id.*).  Hurst was seen by a nurse on February 28, who noted "no visible deformity to hand" (FDOC Chronological Record of Health Care, ECF No. 85-1 at 44).  Hurst was scheduled for further evaluation for a medical pass (*id.*).

Hurst was seen by Dr. Toledo on March 16, 2018, regarding his request for the medical pass (FDOC Chronological Record of Health Care, ECF No. 85-1 at 43).  Dr. Toledo prescribed Naproxen for pain and scheduled a follow-up appointment for May 18, 2018 (*id.*).  A nurse sent the prescription to the pharmacy (*id.*).

Hurst commenced this civil rights action on May 7, 2018 (Compl., ECF No. 1 at 1, 21).

### C.    Discussion

#### 1.    Defendant Dr. Ong

Hurst claims that Dr. Ong acted with deliberate indifference to his medical needs in three respects (*see* Pl.'s Third Am. Compl., ECF No. 36 at 5–7, 12–13, 17).  First, Hurst claims Dr. Ong recklessly postponed his surgery without making any arrangements for him to get surgery elsewhere (*id.* at 5–7, 15).  Second, Hurst claims that during Dr. Ong's surgery, Ong failed to re-attach a tendon and place a splint on the tip of the finger, which resulted in a permanent "Right Dip Mallet Deformity""

(*id.* at 12–13).  Third, Hurst claims Dr. Ong failed to follow-up with him after his final physical therapy session, which created a missed opportunity for corrective surgery to repair the deformity (*id.* at 14–15).

Viewing the facts in the light most favorable to Hurst, no reasonable juror could conclude that Defendant Dr. Ong was deliberately indifferent to Hurst's medical needs.  The undisputed facts show that Dr. Ong had no knowledge of Hurst's need for surgery until February 15, 2017.  Dr. Ong saw Hurst that day and submitted a written request that he receive surgery the next day.  Dr. Ong was "ready, willing and able" to conduct Hurst's procedure on February 16 and expected that Hurst would present for the surgery as Ong had requested the day before.  Hurst was not presented to Dr. Ong for surgery until March 30, 2017.  Dr. Ong was not involved in scheduling the surgery after submitting the required Request for Pre-Approval of Health Care Services form.  There is no evidence suggesting Dr. Ong played any role in the actual scheduling or delay of Hurst's surgery.  Therefore, Dr. Ong did not exhibit deliberate indifference in this regard.

Additionally, Hurst has failed to demonstrate a genuine issue of material fact as to whether his "Mallet finger" deformity was caused by Dr Ong's harming an extensor tendon during surgery.  Dr. Ong opined that "Mallet finger" is generally

caused by a disruption or rupture of the extensor tendon at the distal interphalangeal (DIP) joint, which is typically the result of trauma or a sudden flexing of the tip of the finger (Def. Ong's Answer to Pl.'s Interrog. No. 14, ECF No. 83 at 46).  Dr. Ong further opined that Hurst's tendons were "completely unharmed" during the surgery (Def. Ong's Answer to Pl.'s Interrog. No. 13).  Hurst has not presented any evidence that creates a genuine issue of material fact as to whether the "Mallet finger" deformity was caused by Dr. Ong's surgery.  Therefore, Dr. Ong did not exhibit deliberate indifference in this regard.

Finally, there is no evidence that Dr. Ong was responsible for Hurst's failure to receive a follow-up evaluation with him after Hurst's final physical therapy session.  Dr. Ong ordered the follow-up, and the physical therapist recommended the follow-up.  Dr. Ong states there was no way he could have known if or when Hurst completed the recommended physical therapy.  Dr. Ong also states he was never asked to see or otherwise evaluate Hurst after their follow-up visit on June 28, 2017.  Hurst has not submitted any evidence that creates a genuine issue of material fact as to whether Dr. Ong was responsible for Hurst's failure to receive a follow-up visit with Ong after Hurst completed his last session of physical therapy.  Therefore, Dr. Ong did not exhibit deliberate indifference in this regard.

Considering the summary judgment evidence, Hurst will be unable to prove at trial that Dr. Ong was deliberately indifferent to his medical needs. Therefore, Dr. Ong is entitled to summary judgment in his favor.

### 2.   Defendant Dr. Perez-Lugo

Hurst claims that Dr. Perez-Lugo acted with deliberate indifference to his medical needs in two respects (*see* Pl.'s Third Am. Compl., ECF No. 36 at 7–10, 17). First, Hurst claims that Dr. Perez-Lugo failed to immediately follow-up with the scheduling department regarding scheduling of Hurst's surgery, and Dr. Perez-Lugo failed to implement a "treatment plan" for Hurst's surgery, including referral to another surgeon (*id.* at 7–9). Second, Hurst claims Dr. Perez-Lugo refused to submit a request for Hurst to receive corrective surgery in November of 2017, allegedly due to cost (*id.* at 10–11).

Viewing the facts in the light most favorable to Hurst, no reasonable juror could conclude that deliberate indifference on the part of Dr. Perez-Lugo was the reason Hurst's surgery took place forty-two days after Dr. Ong requested it. The undisputed evidence establishes that Dr. Perez-Lugo pre-approved Hurst's surgery *just two days after* Dr. Ong requested it. Granted, the pre-approval was not sent to the FDOC's Utilization Management section for final approval and scheduling until

a nurse routed it on February 28, 2017, but there is no evidence from which a factfinder could reasonably infer that Dr. Perez-Lugo subjectively knew of this delay or played any role in it.

Hurst contends Dr. Perez-Lugo should have immediately followed-up with the scheduling department regarding scheduling of the surgery, and that Dr. Perez-Lugo should have implemented a "treatment plan," including referring Hurst to another surgeon. But section 1983 does not provide for liability on a theory that Dr. Perez-Lugo "knew or should have known" of a delay that followed his pre-approval or that he breached a duty of care by failing to follow-up or request a referral to another surgeon. Allegations of "knew or should have known" are insufficient to satisfy the subjective element of the deliberate indifference standard—actual knowledge is required. *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013). Further, deliberate indifference requires the defendant to have a subjective state of mind "more blameworthy than negligence," *Farmer*, 511 U.S. at 835, and closer to criminal recklessness, *id.* at 839–40. In the absence of any evidence from which a factfinder could reasonably infer that Dr. Perez-Lugo subjectively knew that the scheduling of Hurst's surgery had been delayed, Hurst has failed to show deliberate indifference in this regard.

Additionally, Hurst has failed to demonstrate a genuine issue of material fact as to whether Dr. Perez-Lugo acted with deliberate indifference by refusing to submit a request for Hurst to receive corrective surgery in November of 2017. The undisputed evidence demonstrates that on November 17, 2017, Dr. Perez-Lugo signed a request for Hurst to receive a surgical evaluation by Dr. Ong for further recommendations regarding Hurst's inability to make a full fist and his decreased range of motion and deformity. Dr. Perez-Lugo's request for the surgical evaluation was denied. Hurst cannot show that Dr. Perez-Lugo acted with deliberate indifference in this regard.

Considering the summary judgment evidence, Hurst will be unable to prove at trial that Dr. Perez-Lugo was deliberately indifferent to his medical needs. Therefore, Dr. Perez-Lugo is entitled to summary judgment in his favor.

### 3.    Defendant Dr. Campbell

Hurst claims that Dr. Erron Campbell, the Regional Medical Director, acted with deliberate indifference to his medical needs in three respects (Pl.'s Third Am. Compl., ECF No. 36 at 9–12, 17). First, Dr. Campbell failed to hire additional plastic surgeons who could have performed Hurst's surgery (*id.* at 9–10). Second, Dr. Campbell denied necessary physical therapy following Hurst's surgery (*id.* at 11).

Third, Dr. Campbell implemented a "one-chance policy" that prohibited corrective surgeries (*id.* at 10, 12).

Hurst's assertion that there was an insufficient number of plastic surgeons is not based upon personal knowledge, and he has proffered no evidence that the reason his surgery took place forty-two days after Dr. Ong requested it was because of an insufficient number of plastic surgeons.  Hurst has no evidence to support the claim that Dr. Campbell failed to hire a sufficient number of plastic surgeons, and thus cannot show that Dr. Campbell acted with deliberate indifference in this regard.

Hurst also claims that Dr. Campbell denied necessary physical therapy following Hurst's surgery.  The relevant facts are these.  On May 24, 2017, Dr. Ong recommended hand physical therapy three times per week for eight weeks.  Dr. Perez-Lugo reviewed Hurst's chart that same day, but there is no evidence that any health care provider completed a Consultation Request for Hurst to receive an evaluation with a physical therapist.  One month later, on June 28, 2017, Dr. Ong repeated his request for physical therapy, this time prescribing two visits per week for eight weeks; and Ong advised Hurst of how absolutely crucial it was for him to begin his therapy in advance, by performing home exercises that Dr. Ong demonstrated, if he hoped to have any decent chance of recovery of function.  Dr.

Perez-Lugo reviewed Hurst's chart on July 10, 2017, and requested that Hurst receive a consultation with a physical therapist.  Hurst's chart and the physical therapy request form were sent to the scheduling department.  The physical therapist evaluated Hurst on August 1, 2017, and recommended two visits per week for eight weeks.  The next day (August 2), Dr. Perez-Lugo completed a request for prior approval for Hurst to receive physical therapy two times a week for eight weeks. The request was faxed to Utilization Management on August 3, 2017, and approved. Hurst did not receive a physical therapy appointment until September 1, and thereafter, he received only two more appointments, on September 21 and 26.

There is no evidence that Dr. Campbell played any role in the delay between Dr. Ong's initial recommendation for physical therapy, on May 24, 2017, and Hurst's first physical therapy appointment, on August 1, 2017.  There is also no evidence that Dr. Campbell played any role in the fact that Hurst did not receive the approved number of physical therapy sessions (i.e., two times per week for eight weeks).  Hurst has no evidence to support this claim that Dr. Campbell denied or otherwise prevented Hurst from receiving the physical therapy recommended by Dr.

Ong and the physical therapist.  Therefore, Hurst cannot show that Dr. Campbell acted with deliberate indifference in this regard.[5]

Similarly, there is no evidence to support Hurst's claim that Dr. Campbell had a "one-chance policy" that prohibited corrective surgeries.  Hurst relies upon evidence of his visit with Dr. Perez-Lugo on November 17, 2017, to support this claim against Dr. Campbell.  Hurst states that when he inquired about surgery to correct the deformity of his little finger and his inability to bend it, Dr. Perez-Lugo opined that there was little chance of improvement.  But the evidence demonstrates that Dr. Perez-Lugo nevertheless completed a request for Hurst to receive a follow-up evaluation with Dr. Ong.  Apparently, Dr. Perez-Lugo's request was rejected, as indicated by the following notations on the Consultant's Report:

> -Please repeat hand x-ray
> -Encourage pt [patient] to continue exercises taught by PT
> -It is unclear what actions pt is unable to perform and how it is affecting ADL's [activities of daily living]
> -Call RMD [Regional Medical Director] to discuss

(Consultant's Report, ECF No. 83 at 50).

---

[5] To the extent Hurst seeks to hold Defendant Dr. Perez-Lugo liable for the initial delay in referring him for physical therapy, there is no evidence in the record from which a factfinder could reasonably infer that the delay was due to Dr. Perez-Lugo's deliberate indifference, as opposed to mere negligence.

Dr. Erron Campbell was the Regional Medical Director at that time.  But the evidence does not support Hurst's contention that Dr. Campbell had a policy that prohibited corrective surgeries.  Further, even if Dr. Campbell was the person who denied Dr. Perez-Lugo's request that Hurst have a follow-up evaluation with Dr. Ong, Dr. Campbell expressed a willingness to discuss the issue further upon receiving more information, specifically, an updated x-ray and specifics as to Hurst's limitations and how his activities of daily living were affected.  Viewing the evidence in the light most favorable to Hurst, no factfinder could reasonably conclude that Dr. Campbell was subjectively aware that Hurst's failure to receive corrective surgery placed him at substantial risk of serious harm.  Therefore, Hurst's deliberate indifference claim fails in this regard.

Considering the summary judgment evidence, Hurst will be unable to prove at trial that Dr. Campbell was deliberately indifferent to his medical needs. Therefore, Dr. Campbell is entitled to summary judgment in his favor.

### 4.    Defendant Centurion

Hurst claims that the conduct of the individual Defendants (Dr. Perez-Lugo and Dr. Campbell) demonstrates that Centurion fostered a "culture of non-

compliance" with its own customs and practices, which amounted to deliberate indifference (Pl.'s Third Am. Compl., ECF No. 36 at 13–16, 17).

When a private entity contracts with a State or municipality to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state and becomes the functional equivalent of the state under section 1983.  *See West v. Atkins*, 487 U.S. 42, 54–57 (1988); *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (internal quotation marks and citation omitted); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).   The plaintiff must prove that the agents of the private medical provider violated his constitutional rights, and that the policy or custom of the private medical provider was the "moving force behind" the deprivation.  *See Craig*, 643 F.3d at 1310.

Here, because Hurst did not suffer a constitutional violation by any agent of Centurion, Centurion is not subject to liability under § 1983.  *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  Therefore, Centurion is thus entitled to summary judgment in its favor.

### 5.   Hurst's Motion for Partial Summary Judgment

In Hurst's motion for partial summary judgment, he argues he is entitled to summary judgment on the issue of each Defendant's liability for the alleged Eighth

Amendment violations, and that the issue of the amount of damages is an issue for trial (Pl.'s Mot. for Partial Summ. J., ECF No. 83 at 1–15).  Hurst's arguments in support of summary judgment are the same arguments he makes in opposition to Defendants' motions for summary judgment.  As discussed *supra*, viewing the evidence in the light most favorable to Hurst, no factfinder could reasonably infer that any Defendant was deliberately indifferent to Hurst's medical needs.  Therefore, Hurst is not entitled to summary judgment in his favor.

## III.    DEFENDANT ZEBLEY'S MOTION TO DISMISS

Hurst asserts an Eighth Amendment claim of deliberate indifference against Defendant Nurse Zebley for her alleged failure to announce her presence in the administrative confinement wing, her failure to provide his prescription for Prozac during his seven-day stay in administrative confinement, and her allegedly discarding his sick-call request concerning his injured hand.

The facts supporting Hurst's claim are the following.  When Hurst was placed in administrative confinement on January 5, 2017, he did not know what time the nurse made her rounds, and the nurse did not announce her presence on the wing, so Hurst did not see the nurse for the first few days (Pl.'s Third Am. Compl. ¶ 12, ECF No. 36 at 4; Hurst Decl. ¶ 3, ECF No. 83 at 22).  On January 8 or 9, 2017, at 5:00–

5:30 a.m., Hurst made contact with Nurse Zebley as she was making her morning medication rounds in the administrative confinement unit (*id.*).  Hurst requested a sick-call request form from Zebley, showed her his hand, and told her that it was swollen, painful, and may be broken (Pl.'s Third Am. Compl. ⊉ 13, ECF No. 36 at 4; Hurst Decl. ⊉ 3, ECF No. 83 at 22).  Nurse Zebley provided Hurst with the sick-call form (*id.*).  Hurst completed the form and gave it back to Nurse Zebley (*id.*).  Hurst was not seen in sick-call, and the sick-call request is not in Hurst's medical file (*id.*).  Hurst alleges "upon information and belief" that Nurse Zebley discarded the sick-call request instead of processing it (Pl.'s Third Am. Compl. ⊉ 13, ECF No. 36 at 4–5; Hurst Decl. ⊉ 3, ECF No. 83 at 22).

Hurst also alleges that during his seven-day stay in administrative confinement, the nurse did not deliver his daily dose of prescribed medication, Prozac (Pl.'s Mot. for Partial Summ. J. ⊉ 3, ECF No. 83 at 2–3, and attached Medical and Treatment Record, ECF No. 83 at 20).

Nurse Zebley seeks dismissal of Hurst's claims for failure to exhaust administrative remedies (Zebley's Mot. to Dismiss, ECF No. 134).  However, the court need not address the exhaustion issue, because Hurst's Third Amended Complaint does not state a plausible constitutional claim against her.

In considering whether an IFP prisoner/plaintiff's claim is subject to dismissal under 28 U.S.C. § 1915(e)(2)(B)(ii) or § 1915A(b)(1), the court accepts all well-pleaded factual allegations of the complaint as true and evaluates all reasonable inferences derived from those facts in the light most favorable to the plaintiff. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994). A complaint, or any claim therein, will be dismissed if it fails to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (holding that courts must follow the Supreme Court's "'two-pronged approach' of first separating out the complaint's conclusory legal allegations and then determining whether the remaining well-pleaded factual allegations, accepted as true, 'plausibly give rise to an entitlement to relief.'" (quoting *Iqbal*, 556 U.S. at 679)). The court is not required to accept as true any conclusory allegation "upon information and belief" that is unaccompanied by enough facts to make that statement plausible. *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 557); *see also, e.g., Smith v. City of Sumiton*, 578 F. App'x. 933, 935 n.4 (11th Cir. 2014) (unpublished but cited as persuasive authority) ("[F]or purposes of a Rule

12(b)(6) motion to dismiss, we do not have to take as true allegations based merely 'upon information and belief.'") (quoting *Mann*, *supra*).

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). As the Supreme Court reiterated in *Iqbal*, although Rule 8 of the Federal Rules of Civil Procedure does not require detailed factual allegations, it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A complaint must state a plausible claim for relief, and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The mere possibility that the defendant acted unlawfully is insufficient to survive dismissal. *Id.* The complaint must include "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, that is, "across the line from conceivable to plausible." *Id.* at 570.

Here, Hurst's allegation that Nurse Zebley discarded his sick-call request, instead of processing it, is based merely upon "information and belief" without any accompanying facts to make that statement plausible. This conclusory allegation is

insufficient to plausibly suggest that the lack of processing of his sick-call request was due to deliberate indifference on the part of Nurse Zebley, as opposed to mere negligence on either her part or someone else's.

The same is true of Hurst's allegation regarding "the nurse's" failure to announce her presence in the wing and "the nurse's" failure to provide the prescribed Prozac. Assuming that both of these facts are true, and assuming that Defendant Zebley was the administrative confinement nurse during the entire week that Hurst was in confinement, Hurst does not allege any facts suggesting that the nurse's failures were due to deliberate indifference as opposed to negligence.[6]

Hurst's allegations fail to state a plausible Eighth Amendment claim against Defendant Zebley. Therefore, his claim against this Defendant should be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1).

IV.   DEFENDANT DELANEY

Hurst's Third Amended Complaint asserts an Eighth Amendment claim of deliberate indifference against Defendant "Nurse Jane Doe I," who was later identified as Christin Judd Delaney. On March 26, 2019, the court directed service

---

[6] Notably, Hurst does not allege he notified the nurse that he had not received his prescribed medication (Prozac) when he talked to her during the middle of his seven-day stay in confinement.

of Hurst's Third Amended Complaint upon the then-identified Defendants, who were Dr. Ong, Dr. Perez-Lugo, Dr. Campbell, and Centurion (*see* ECF No. 39).  On May 31, 2019, the court notified Hurst that he must use the tools of discovery to identify the "Nurse Jane Doe I" (*see* ECF No. 46).  The court instructed Hurst that when he determined the identity and location of the "Nurse Jane Doe I," he must file a motion with the court requesting entry of an order directing service of process (*see id.*).

At of the close of discovery, on February 27, 2020 (*see* ECF No. 81), Hurst had not notified the court of the identity of "Nurse Jane Doe I."  Therefore, on May 15, 2020, the court issued a show cause order directing Hurst to show cause, within thirty (30) days, why his claim against this Defendant should not be dismissed based on his inability to identify and effect service of process (*see* ECF No. 100).  The court notified Hurst that he could comply with the show cause order by providing the name and address of "Nurse Jane Doe I" (*see id.*).

Hurst responded to the show cause order, stating he attempted to ascertain the identity of this Defendant during discovery (*see* ECF No. 102).  After reviewing the relevant discovery materials, the court required Centurion to notify the court of the identity of the "Nurse Jane Doe I" or explain its inability to do so (*see* ECF No. 103).

The court further directed Centurion that if it identified the nurse, Centurion must either provide an address (in confidence) where the nurse may be served with process, or waive service of process on behalf of the nurse (*see id.*).

On July 2, 2020, Centurion identified "Nurse Jane Doe I" as Christin Judd Delaney, RN, and provided her last known address under seal (*see* ECF No. 104). The court directed the United States Marshals Service (USMS) to serve Defendant Delaney at the address provided by Centurion (*see* ECF No. 105). On August 26, 2020, the USMS returned the summons for Delaney unexecuted, with a notation that it was unable to locate her at the address provided by Centurion (*see* ECF No. 112).

The court made additional efforts to locate Defendant Delaney. From information available on the Florida Department of Health's (FDOH) public website, the court learned that the FDOH issued Delaney's current professional license on February 3, 2014, and at that time, she listed her address as Union C.I. (*see* ECF No. 113), which is the same address that Hurst listed for Nurse "Jane Doe I" in the Third Amended Complaint (*see* Pl.'s Third Am. Compl., ECF No. 36 at 3, 19). Because Centurion is still the contracted medical provider for all FDOC institutions, the court required Centurion to notify the court whether Defendant Delaney was still its employee (*see* ECF No. 113). Centurion responded that

Delaney was no longer employed by Centurion or a Centurion-affiliated entity (*see* ECF No. 116).  The last known address provided by Centurion to the USMS is thus the most recent address that has been discovered after exhaustive efforts to locate Defendant Delaney.

Under Rule 4(m) of the Federal Rules of Civil Procedure, the court "must dismiss the action without prejudice . . . or order that service be made within a specified time" if a defendant is not served within ninety days after the complaint was filed.  Fed. R. Civ. P. 4(m).  If a plaintiff shows "good cause" for the failure to serve within ninety days, the court "must extend the time for service for an appropriate period."  *Id.*

A plaintiff proceeding IFP under § 1915 is entitled to have the clerk of court and the USMS effect service of process upon defendants.  *See* 28 U.S.C. § 1915(d); Fed. R. Civ. P. 4(c)(3); *Bilal v. Geo Care, LLC*, 981 F.3d 903, 919 (11th Cir. 2020).  "[T]he failure of the United States Marshal to effectuate service on behalf of an in forma pauperis plaintiff through no fault of that plaintiff constitutes 'good cause' for the plaintiff's failure to effect timely service within the meaning of Rule 4(m)."  *Rance v. Rocksolid Granit USA, Inc.*, 583 F.3d 1284, 1288 (11th Cir. 2009).  Further, the Eleventh Circuit has said that it is unreasonable to expect prisoners proceeding

pro se to provide the current addresses of prison-guard defendants who no longer work at a prison.  *Richardson*, 598 F.3d at 739–40 (citing *Sellers v. United States*, 902 F.2d 598, 602 (7th Cir. 1990)).  Thus, so long as the USMS can locate the defendant with "reasonable effort," a plaintiff establishes "good cause" under Rule 4(m) by providing enough information to identify the prison-guard defendant.  *Id.* at 740.

Even when a plaintiff cannot demonstrate "good cause," the district court "must still consider whether any other circumstances warrant an extension of time based on the facts of the case."  *Bilal*, 903 F.3d at 919 (internal quotation marks and citation omitted).  For example, the Eleventh Circuit has explained that where the statute of limitations would preclude refiling, the Advisory Committee Note to Rule 4(m) suggests that an extension might be appropriate.  *Id.* (internal quotation marks and citation omitted).  So a district court may exercise its discretion to dismiss the case without prejudice or to direct service to be accomplished within a set time only after it evaluates any factors that may bear on this determination.  *Id.* (citation omitted).

Here, more than ninety days has passed since the court directed service of Hurst's Third Amended Complaint, on March 26, 2019 (indeed, well over one year

has passed) (*see* ECF No. 39).  Defendant Delaney has not been served with process despite reasonable efforts by the court and the USMS to locate her.  Although the statute of limitations will preclude Hurst from refiling his § 1983 claim (because the statute of limitations is four years for § 1983 claims, and Defendant Delaney's alleged conduct occurred on January 5, 2017), extending the time to effect service of process would be futile as there appears to be no other known avenue to discover Defendant Delaney's whereabouts.  Therefore, Hurst's claim against Defendant Delaney should be dismissed pursuant to Rule 4(m).

## V.    CONCLUSION

Dr. Ong and the Centurion Defendants are entitled to summary judgment in their favor on the claims asserted in Hurst's Third Amended Complaint.  Therefore, Defendants' motions for summary judgment should be granted, and Hurst's motion for summary judgment should be denied.  Dr. Ong and the Centurion Defendants are entitled to entry of judgment in their favor and against Hurst.

Hurst's factual allegations fail to state a plausible constitutional claim against Nurse Zebley.  Therefore, his claim against her should be dismissed with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and § 1915A(b)(1).

Hurst's claim against Defendant Delaney should be dismissed for failure to effect service of process, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

Accordingly, it is respectfully **RECOMMENDED**:

1.     The motions for summary judgment filed by Defendants Ong, Perez-Lugo, Campbell, and Centurion (ECF Nos. 84, 85) be **GRANTED** and judgment entered in Defendants' favor.

2.     Plaintiff's motion for partial summary judgment (ECF No. 83) be **DENIED**.

3.     Plaintiff's claim against Defendant Zebley be **DISMISSED with prejudice** for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1).

4.     Plaintiff's claim against Defendant Delaney be **DISMISSED** for failure to effect service of process, pursuant to Rule 4(m+) of the Federal Rules of Civil Procedure.

At Pensacola, Florida this <u>15</u>th day of January 2021.

*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**